pg 24 Case 3:10-cv-03123-RTD    Document 5-10    Filed 12/20/10    Page 1 of 6 PageID #: 48   Exhibit J

## Ticketmaster Corp. v. Tickets.com, Inc.

United States District Court for the Central District of California

2003 U.S. Dist. LEXIS 6483

March 6, 2003, Decided

March 7, 2003, Filed

This motion by defendant Tickets.com, Inc. (hereafter TX) for summary judgment on plaintiffs Ticketmaster Corporation and Ticket Online-CitySearch, Inc. (hereafter collectively TM), intellectual property issues is denied as to the contract claim of TM and granted as to the copyright and trespass to chattels claims, which are dismissed by this minute order.

At this point in the case, both parties have narrowed their claims. TM, the original plaintiff, has narrowed its intellectual property claims to a contract theory, a copyright theory, and a trespass to chattels theory. The court finds triable issues of fact on the contract theory and finds no triable issues of fact and grants summary judgment on the copyright and trespass to chattels claims.

Many of the factual items are not contested, although the legal result of applying the law to the uncontested facts is heavily contested. Among the uncontested facts are the following: Both TM and TX are in the business of selling tickets to all kinds of "events" (sports, concerts, plays, etc.) to the public. They are in heavy competition with one another, but operate in distinctive ways. TM is the largest company in the industry. It sells tickets by the four methods of ticket selling--venue box office, retail outlets, by telephone, and over the internet. Telephone and internet sales require the customer to establish credit with the ticket seller (usually by credit card). Internet sales have been the fastest growing segment of the industry. TX at the time of the events considered in this motion was primarily (but not exclusively) an internet seller. Both TM and TX maintain a web page reachable by anyone with an internet connection. Each of their web pages has many subsidiary (or interior) web pages which describe one event each and provide such basic information as to location, date, time, description of the event, and ticket prices. The TM interior web pages each have a separate electronic address or Uniform Resource Locator ("URL") which, if possessed by the internet user, allows the user to reach the web page for any particular event by by-passing the "home" web page and proceeding past the index to reach the interior web page for the event in question. The TM interior web pages provide telephone numbers for customers or allow the customer to order tickets to the event by interactive computer use. A charge is made for the TM service.

TM principally does business by exclusive contracts with the event providers or their producers, and its web pages only list the events for which TM is the exclusive ticket seller. TX also sells tickets to a number of events for which it is the ticket seller. At one point, its web pages attempted to list all events for which tickets were available whether or not TX sold the tickets. Its interior web pages also listed the event, the date, time, ticket prices, and provided for internet purchase if TX could sell the tickets. When TX could not sell the tickets, it listed ticket brokers who sold at premium prices. In early 2000, TX discontinued this practice of listing events with tickets sold by other ticket brokers. Until early 2000, in situations where TM was the only source of tickets, TX provided a "deep link" by which the customer would be transferred to the interior web page of TM's web site, where the customer could

purchase the ticket from TM. This process of "deep linking" is the subject of TM's complaint in this action, of which there is now left the contract, copyright, and trespass theories.

Starting in 1998 and continuing to July 2001, when it stopped the practice, TX employed an electronic program called a "spider" or "crawler" to review the internal web pages (available to the public) of TM. The "spider" "crawled" through the internal web pages to TM and electronically extracted the electronic information from which the web page is shown on the user's computer. The spider temporarily loaded this electronic information into the Random Access Memory ("RAM") of TX's computers for a period of from 10-15 seconds. TX then extracted the factual information (event, date, time, tickets prices, and URL) and discarded the rest (which consisted of TM identification, logos, ads, and other information which TX did not intend to use; much of this discarded material was protected by copyright). The factual information was then organized in the TX format to be displayed on the TX internal web page. The TX internal web page carried no TM identification and had only the factual information about the event on it which was taken from TM's interior web page but rearranged in TX format plus any information or advertisement added by TX. From March 1998, to early 2000, the TX user was provided the deep linking option described above to go directly from the TX web site to the relevant TM interior web page. This option stopped (or was stopped by TM) in early 2000. For an unknown period afterward, the TX customer was given the option of linking to the TM home page, from which the customer could work his way to the interior web page in which he was interested. (The record does not reveal whether this practice still exists or whether TM objects to it.) Thus, the intellectual property issues in this case appear to be limited to events which occurred between November 1998, when spidering started, and July 2001, when it stopped. The "deep linking" aspect of the case is relevant only from March 1998, to early 2000, when it stopped.

The contract aspect of the case derives from a notice placed on the home page of the TM web site which states that anyone going beyond that point into the interior web pages of the web site accepts certain conditions, which include, relevant to this case, that all information obtained from the website is for the personal use of the user and may not be used for commercial purposes. Earlier in this case (and at the time of the motion for preliminary injunction) the notice was placed at the bottom of the home page of the TM web site, so that a user without an especially large screen would have to scroll down the page to read the conditions of use. Since then, TM has placed in a prominent place on the home page the warning that proceeding further binds the user to the conditions of use. As one TX executive put it, it could not be missed. At the time of the preliminary injunction motion, the court commented that there was no evidence that the conditions of use were known to TX. Since then, there has been developed evidence that TX was fully familiar with the conditions TM claimed to impose on users, including a letter from TM to TX which quoted the conditions (and a reply by TX stating that it did not accept the conditions). Thus, there is sufficient evidence to defeat summary judgment on the contract theory if knowledge of the asserted conditions of use was had by TX, who nevertheless continued to send its spider into the TM interior web pages, and if it is legally concluded that doing so can lead to a binding contract. For reasons dealing with the desirability of clear unmistakable evidence of assent to the conditions on trial of such issues, the court would prefer a rule that required an unmistakable assent to the conditions easily provided by requiring clicking on an icon which says "I agree" or the equivalent. Such a rule would provide certainty in trial and make it clear that the user had called to his attention the conditions he or she accepted when using the web site. (The court notes that Professor Lemley also approves this approach, but this is treated as a legal opinion, not a fact). However, the law has not developed this way. Use of a cruise ship ticket with a venue provision printed on the back commits one to the venue provided. (Carnival Cruise Lines v. Shute ('91), 499 U.S. 585, 113 L. Ed. 2d

622, 111 S. Ct. 1522.) The Carriage of Goods by Sea Act, the Carmack Act, and the Warsaw Convention provide that limitations of liability on the bill of lading, air waybill, or airplane ticket are enforceable if the services are used by the customer. The "shrinkwrap" cases find the printed conditions plainly wrapped around the cassette or CD enforceable. Even the back of your parking lot ticket may be enforceable. The principle has been applied to cases similar to this. (Register.com, Inc. v. Verio, Inc. (SDNY'00) 126 FSupp2d 238; Pollstar v. Gigmania Ltd. (EDCA'00) 170 FSupp2d 974.) The principle has long been established that no particular form of words is necessary to indicate assent-the offeror may specify that a certain action in connection with his offer is deemed acceptance, and ripens into a contract when the action is taken. (Binder v. Aetna Life Ins. Co. ('99) 75 Cal. App. 4th 832, 89 Cal. Rptr. 2d 540; Penn Sec. Life Ins. Co. v. Rising 62 CA3d 302, 133 Cal. Rptr. 59.) Thus, as relevant here, a contract can be formed by proceeding into the interior web pages after knowledge (or, in some cases, presumptive knowledge) of the conditions accepted when doing so. In Specht v. Netscape Communs. Corp. (2Cir'02) 306 F.3d 17, the court found that there was no mutual assent when a notice of the existence of license terms governing the use of software was visible to internet users only if they scrolled down the screen. That case is distinguishable from the facts at hand on the grounds that in Specht, the plaintiff's terms of use were not plainly visible or known to defendants. See id. at 31. Moreover, Specht involved a different set of circumstances, that of consumers invited to download free software from an internet site that did not contain a plainly visible notice of license terms. See id. at 32. As a result, the TX motion for summary judgment on the contract issue is denied.

The trespass to chattels issue requires adapting the ancient common law action to the modern age. No cases seem to have reached the appellate courts although there appears to be a number of district court cases. One case (Intel Corp. v. Hamadi ('01) 94 Cal. App. 4th 325, 114 Cal. Rptr. 2d 244) is pending in the California Supreme Court since it granted a hearing which has the effect of vacating the state Court of Appeal opinion (and which has no precedent value once the hearing was granted). The court is informed that the eBay, Inc. v. Bidder's Edge, Inc. (NDCA' 00) 100 F. Supp. 2d 1058 preliminary injunction was not appealed. At the time of the preliminary injunction motion, only the eBay case was before the court. Since then, there have been a number of district court cases discussing the chattel theory (some published and some not). These cases tend to support the proposition that mere invasion or use of a portion of the web site by a spider is a trespass (leading at least to nominal damages), and that there need not be an independent showing of direct harm either to the chattel (unlikely in the case of a spider) or tangible interference with the use of the computer being invaded. However, scholars and practitioners alike have criticized the extension of the trespass to chattels doctrine to the internet context, noting that this doctrinal expansion threatens basic internet functions (i.e., search engines) and exposes the flaws inherent in applying doctrines based in real and tangible property to cyberspace. See, Laura Quilter, Cyberlaw: The Continuing Expansion of Cyberspace Trespass to Chattels, 17 Berkeley Tech. L. J. 421 (2002); Clifton Merrell, Trespass to Chattels in the Age of the Internet, 80 Wash. U. L. Q. 675 (2002); Mary Anne Bendotoff and Elizabeth R. Gosse, "Stay Off My Cyberproperty!": Trespass to Chattels on the Internet (2001), 6 Intell. Prop. L. Bull. 12; Edward Lee, Rules and Standards for Cyberspace, 77 Notre Dame L. Rev. 1275, 1283-1284 (2002). Pending appellate guidance, this court comes down on the side of requiring some tangible interference with the use or operation of the computer being invaded by the spider. Restatement (Second) of Torts § 219 requires a showing that "the chattel is impaired as to its condition, quality, or value." Therefore, unless there is actual dispossession of the chattel for a substantial time (not present here), the elements of the tort have not been made out. Since the spider does not cause physical injury to the chattel, there must be some evidence that the use or utility of the computer (or computer network) being "spiderized" is adversely affected by the use of the spider. No such evidence is presented here. This court respectfully disagrees with other district courts' finding that mere use of a spider to enter a publically available web site to



gather information, without more, is sufficient to fulfill the harm requirement for trespass to chattels.

TM complains that the information obtained by the use of the spider was valuable (and even that it was sold by TX), and that it spent time and money attempting to frustrate the spider, but neither of these items shows damage to the computers or their operation. One must keep in mind that we are talking about the common law tort of trespass, not damage from breach of contract or copyright infringement. The tort claim may not succeed without proof of tort-type damage. Plaintiff TM has the burden to show such damage. None is shown here. The motion for summary judgment is granted to eliminate the claim for trespass to chattels. This minute order is the order eliminating that claim. This approach to the tort of trespass to chattels should hurt no one's policy feelings; after all, what is being attempted is to apply a medieval common law concept in an entirely new situation which should be disposed of by modern law designed to protect intellectual property interests.

The copyright issues are more difficult. They divide into three issues. The first is whether the momentary resting in the TX computers of all of the electronic signals which are used to form the video representation to the viewer of the interior web pages of the TX computer constitutes actionable copyright infringement. The second is whether the URLs, which were copied and used by TX, contain copyrightable material. The third is whether TX's deeplinking caused the unauthorized public display of TM event pages. In examining these questions, we must keep in mind a prime theorem of copyright law--facts, as such, are not subject to copyright protection. What is subject to copyright protection is the manner or mode of expression of those facts. Thus, addresses and telephone numbers contained in a directory do not have copyright protection (Feist Publications v. Rural Tel. Serv. Co., 499 U.S. 340, 113 L. Ed. 2d 358, 111 S. Ct. 1282), despite the fact that time, money, and effort went into compiling the information. Similarly, in this case, the existence of the event, its date and time, and its ticket prices, are not subject to copyright. Anyone is free to print (or show on the internet) such information. Thus, if TX had sat down a secretary at the computer screen with instructions manually to go through TM's web sites and pick out and write down purely factual information about the events, and then feed it into the TX web pages (using the TX distinctive format only), no one could complain. The objection is that the same thing was done with an electronic program. However, the difference is that the spider picks up all of the electronic symbols which, if it had been put on a monitor with the right software, would duplicate the TM web page. However, this is not the way it was done. The spider picks up the electronic symbols and loads them momentarily (for 10 to 15 seconds) into the RAM of the TX computers, where a program picks up the factual data (not protected), places same into the TX format for its web pages, and immediately discards the balance, which may consist of TM logos, TM advertisements, TM format for presentation of the material, and other material which is copyrightable. Thus, the actual copying (if it can be called that) is momentary while the non-protected material, all open to the public, is extracted. Is this momentary resting of the electronic symbols from which a TM web page could be (but is not) constructed fair use where the purpose is to obtain nonprotected facts? The court thinks the answer is "yes". There is not much law in point. However, there are two Ninth Circuit cases which shed light on the problem. They are Sony Computer Entm't, Inc. v. Connectix Corp. (9Cir'00) 203 F3d 596 and Sega Enters. v. Accolade, Inc. (9Cir'92) 977 F2d 1510. In each of these cases, the alleged infringer attempted to get at non-protected source code by reverse engineering of the plaintiff's copyrighted software. In doing so, the necessary method was to copy the software and work backwards to derive the unprotected source code. The copied software was then destroyed. In each case, this was held to be fair use since it was necessary to temporarily copy the software to obtain the non-protected material. There may be a difference with this case, however; at least TM claims so. It asserts in its points and authorities that taking the temporary copy in this case was not the only way to



obtain the unprotected information, and that TX was able to, and in actuality did purchase such information from certain third-parties. Both Sony and Sega stated that the fair use was justified because reverse engineering (including taking a temporary copy) was the only way the unprotected information could be obtained. Although this court recognizes that the holdings of Sony and Sega were limited to the specific context of "disassembling" copyrighted object code in order to access unprotected elements contained in the source code, this court believes that the "fair use" doctrine can be applied to the current facts.

Taking the temporary copy of the electronic information for the limited purpose of extracting unprotected public facts leads to the conclusion that the temporary use of the electronic signals was "fair use" and not actionable. In determining whether a challenged use of copyrighted material is fair, a court must keep in mind the public policy underlying the Copyright Act: to secure a fair return for an author's creative labor and to stimulate artistic creativity for the general good. This court sees no public policy that would be served by restricting TX from using spiders to temporarily download TM's event pages in order to acquire the unprotected, publicly available factual event information. The rest of the event page information (which consisted of TM identification, logos, ads, and other information) was discarded and not used by TX and is not exposed to the public by TX. In temporarily downloading TM's event pages to its RAM through the use of spiders, TX was not exploiting TM'S creative labors in any way: its spiders gathered copyrightable and non-copyrightable information alike but then immediately discarded the copyrighted material. It is unlikely that the spiders could have been programmed to take only the factual information from the TM web pages without initially downloading the entire page.

Consideration of the fair use factors listed in 17 USC § 106 supports this result. First, TX operates its site for commercial purposes, and this fact tends to weigh against a finding of fair use. Campbell v. Acuff-Rose Music ('94), 510 U.S. 569 at 585, 127 L. Ed. 2d 500 at 519, 114 S. Ct. 1164. TX's use of the data gathered from TM's event pages was only slightly transformative. As for the second factor, the nature of the copyrighted work, the copying that occurred when spiders download the event page, access the source code for each page, and extract the factual data embedded in the code, is analogous to the process of copying that the Sony court condoned (however, the Court recognizes that the fair use holding from that decision does not fit perfectly onto the facts at hand). Third, because TX's final product-the TX web site-did not contain any infringing material, the "amount and substantiality of the portion used" is of little weight. Connectix (9Cir'00) 203F3d at 606 (quoting Sega(9Cir'93) 977 F2d at 1526-1537). The fourth factor (the effect on the market value of the copyrighted work) is, of course nil, and weighs towards finding fair use. TM's arguments and evidence regarding loss of advertising revenue, as well as the loss of potential business with Volt Delta, are not persuasive.

The second copyright problem is whether the URLs (Uniform Resource Locator) are subject to copyright protection. The URLs are copied by TX and, while TX was deep hyper-linking to TM interior web pages, were used by TX to allow the deep-linking (by providing the electronic address of the particular relevant TM interior web page). This electronic address is kept in TX's computer (not provided to the customer) but was used to connect the customer to the TM interior web page when the customer pushed the button to be transferred to the web page of the broker who sells the tickets. In fact, anyone who uses the TM interior web page-TM customer or not--uses the URL to get there, although sometimes through another computer which also has the URL. TM contends that, although the URLs are strictly functional, they are entitled to copyright protection because there are several ways to write

the URL, and, thus, original authorship is used. The court disagrees. A URL is simply an address, open to the public, like the street address of a building, which, if known, can enable the user to reach the building. There is nothing sufficiently original to make the URL a copyrightable item, especially the way it is used. Feist Publications ('91), 499 U.S. 340, 113 L. Ed. 2d 358 at 369, 111 S. Ct. 1282. There appear to be no cases holding the URLs to be subject to copyright. On principle, they should not be.

The third copyright problem is whether TX's deep linking caused the unauthorized public display of TM event pages in violation of TM's exclusive rights of reproduction and display under 17 U.S.C. § 106. The Ninth Circuit in Kelly v. Arriba Soft Corp. (9Cir'02) 280 F3d 934, recognized that inline linking and framing of full-sized images of plaintiff's copyrighted photographs within the defendant's web site violated the plaintiff's public display rights. In that case, defendant's web site contained links to plaintiff's photographs (which were on plaintiff's publicly available website). Users were able to view plaintiff's photographs within the context of defendant's site: Plaintiff's images were "framed" by the defendant's window, and were thus surrounded by defendant web page's text and advertising. In one short paragraph in a declaration offered on the preliminary injunction motion, TM alleges that when a user was deep-linked from the TX site to a TM event page, a smaller window was opened. The smaller window was described as containing a page from the TM web site which was "framed" by the larger window. At the time of the preliminary injunction motion, TX stated that whether "framing" occurs or not depends on the settings on the user's computer, over which TX has no control. Thus, framing occurred on some occasions but not on others. However, TX says that it "did not try to disguise a sale by use of frames occurring on the Tickets.com website." (Reply, p. 10) TX further states that when users were linked to TM web pages, the TM event pages were clearly identified as belonging to TM.

However, even if the TM interior web site page was "framed" within the TX web page, this case is distinguishable from Kelly. In Kelly, the defendant's site would display a variety of "thumbnail" images as a result of the user's search. By clicking on the desired thumbnail image, a user could view the "Images Attributes" page, which displayed the original full-size image, a description of its dimensions, a link to the originating web site, and defendant's banner and advertising. The full-size image was not technically located on defendant's web site, but was taken directly from the originating web site. However, only the image itself, and not any other part of the originating web site, was displayed on the "Images Attributes" page. The Ninth Circuit determined that by importing plaintiff's images into its own web page, and by showing them in the context of its own site, defendant infringed upon plaintiff's exclusive public display right.

In this case, a user on the TX site was taken directly to the originating TM site, containing all the elements of that particular TM event page. Each TM event page clearly identified itself as belonging to TM. Moreover, the link on the TX site to the TM event page contained the following notice: "Buy this ticket from another online ticketing company. Click here to buy

tickets. These tickets are sold by another ticketing company. Although we can't sell them to you, the link above will take you directly to the other company's web site where you can purchase them." (2d Am. Compl. Ex.I) (emphasis in original) Even if the TM site may have been displayed as a smaller window that was literally "framed" by the larger TX window, it is not clear that, as matter of law, the linking to TX event pages would constitute a showing or public display in violation of 17 U.S.C. § 106(5). Accordingly, summary judgment is granted on the copyright claims of TM and it is eliminated from this action.